# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Joseph E. Welsh

Sharon J.Davis, hsuband and wife

## DEFENDANTS

Linda Male

Michael P. McFadden

- - - Plaese see continuation sheet

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Northampton
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Northampton
(IN U.S. PLAINTIFF CASES ONLY)

NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(C)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)
John P. Karoly, Jr., Esq.

KAROLY LAW OFFICES, P.C.

!555 N. 18th St, Allentown PA  18104

610.820.9790

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)    AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☒ 442 Employment | **HABEAS CORPUS:** | ☐ 790 Other Labor Litigation | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc Security Act | ☐ 871 IRS   Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

42 U.S.C.Sect. 2000e-3; 42 U.S.C. Sect. 1983

Wrongful Discharge, Failure to Promote, First and Fourteeth Amend. violations, state claims

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

**DEMAND $** In excess of $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE _____

DOCKET NUMBER _____

DATE
December 30, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**FOR THE EASTERN** ~~DISTRICT OF~~ ~~PENNSYLVANIA~~ DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose
of assignment to appropriate calendar.

Address of Plaintiff: _119 West SaintJoseph Street, Easton PA  18042_

Address of Defendant: _1 South Third Street, Easton PA  18042_

Place of Accident, Incident or Transaction: _1 South Third Street, Easton PA  18042_

*(Use Reverse Side For Additional Space)*

Does this case involve multidistrict litigation possibilities?                                                      Yes☐   No☐X
*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

                                                                                                Yes☐   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated
   action in this court?

                                                                                                Yes☐   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously
   terminated action in this court?

                                                                                                Yes☐   No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify)

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, _John P. Karoly, Jr._ , counsel of record do hereby certify:

   ☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case
exceed the sum of $150,000.00 exclusive of interest and costs;

   ☒ Relief other than monetary damages is sought.

DATE: _12/30/05_                                                    22224

                                                        Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court
except as noted above.
DATE: _12/30/05_                                                    22224

CIV. 609 (9/99)                      Attorney I.D.#                      Attorney I.D.#

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Joseph E. Welsh | : | CIVIL ACTION |
| Sharon J. Davis | : | |
| v. | : | |
| Linda Male, et al. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus — Cases brought under 28 U.S.C. §2241 through §2255. ( )

(b) Social Security — Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration — Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos — Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management -- Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) (X )

(f) Standard Management — Cases that do not fall into any one of the other tracks. ( )

12/30/05
**Date**

John P. Karoly, Jr.

Attorney at law

Attorney for Plaintiffs

(Cw. 660) 7/95

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH E.WELSH and | : | |
| SHARON J. DAVIS, husband and wife, | : | |
| 119 West Saint Joseph Street | : | |
| Easton, PA 18042 | : | No. |
|           Plaintiffs | : | |
| | : | |
|     v. | : | JURY TRIAL DEMANDED |
| | : | |
| LINDA MALE, | : | |
| 1 South Third Street, Easton PA 18042, | : | |
| individually and in her official capacities as | : | |
| Assistant Treasurer and de-facto Assistant | : | |
| Controller of the City of Easton, | : | |
| | : | |
| MICHAEL P. McFADDEN, | : | |
| 109 North Second Street, Easton PA 18042 | : | |
| individually and in his official capacities as | : | |
| Mayor, Business Administrator, and | : | |
| EEO Officer of the City of Easton, | : | |
| | : | |
| TIMOTHY D. PICKEL, | : | |
| 1149 Spring Garden Street, | : | |
| Easton PA 18042, individually and | : | |
| in his official capacity as a member of | : | |
| Easton City Council, | : | |
| | : | |
| SANDRA A. VULCANO, | : | |
| 1 South Third Street, Easton PA 18042, | : | |
| individually and in her official capacity as | : | |
| a member of Easton City Council, | : | |
| | : | |
| MICHAEL P. FLECK, | : | |
| 1 South Third Street, Easton PA 18042, | : | |
| individually and in his official capacity as | : | |
| a member of Easton City Council, | : | |
| | : | |

DANIEL CORPORA,                                          :
825 Seitz Street, Easton PA 18042,                       :
individually and in his official capacity as             :
a member of Easton City Council,                         :
                                                         :
BURNS BAMFORD,                                           :
378 West Lincoln Street, Easton PA 18042,  :
individually and in his official capacity as             :
a member of Easton City Council,                         :
                                                         :
MAYOR PHILIP B. MITMAN                                   :
1 South Third Street, Easton PA 18042,                   :
individually and in his official capacity as             :
Mayor of the City of Easton,                             :
                                                         :
STUART GALLAHER,                                         :
1 South Third Street, Easton PA 18042,                   :
individually and in his official capacites as            :
Chief of Staff and Acting Mayor of                       :
the City of Easton,                                      :
                                                         :
WILLIAM K. MURPHY, ESQUIRE,                              :
127 N. Fourth Street, Easton PA 18042                    :
individually, and in his official capacity as            :
Solicitor for the City of Easton,                        :
                                                         :
HOWARD WHITE,                                            :
1 South Third Street, Easton PA 18042,                   :
individually and in his official capacity as             :
a member of Easton City Council,                         :
                                                         :
DAVID FLECK,                                             :
1 South Third Street, Easton PA 18042,                   :
individually and in his official capacity as             :
Treasurer of the City of Easton,                         :
                                                         :
ROBERT WILLEVER,                                         :
1 South Third Street, Easton PA 18042,                   :
individually and in his official capacity as             :

Controller of the City of Easton,                          :
                                                           :
KENNETH SNYDER, Sr.,                                       :
1042 West Berwick St, Easton PA 18042      :
individually,                                              :
                                                           :
and                                                        :
                                                           :
THE CITY OF EASTON,                                        :
1 South Third Street, Easton PA 18042,      :
                          Defendants.                      :

## COMPLAINT

Nature of the Action

1.    The original jurisdiction and venue of this Court is invoked in this District

      pursuant to Title 42 U.S.C. § 1601.28, Title 42 U.S.C. § 1983, 28 U.S.C. §§

      1331, 1391, 2201, 2202, 1343, and the claim is substantively based on 42

      U.S.C. § 2000e-3, and 42 U.S.C. § 1983, et seq..

2.    The supplemental jurisdiction of this Court is invoked pursuant to Title 28

      U.S.C. § 1367, to consider Plaintiffs' claims arising under Pennsylvania

      statutory and common law.

3.    Venue is proper in the Eastern District of Pennsylvania in that some or all of

      the events complained of herein occurred in Northampton County,

      Pennsylvania and/or some or all of the Defendants herein reside or have

      their principal place of business within the boundaries of this District.

3

4.    Plaintiff Welsh filed a complaint with the Pennsylvania Human Relations

      Commission, docketed at 200400045, and with the Equal Employment

      Opportunities Commission, docketed at 17FA463711. The Human

      Relations Commission, as the lead agency pursuant to a work-sharing

      agreement, issued a right to sue letter to Plaintiff Welsh dated December 6,

      2005.

The Parties

5.    Plaintiff Joseph E. Welsh (hereinafter "Welsh") is an adult individual and

      resident of the Commonwealth of Pennsylvania, residing at 119 West Saint

      Joseph Street, Easton, Pennsylvania.

6.    Plaintiff Sharon J. Davis (hereinafter "Davis") is an adult individual and

      resident of the Commonwealth of Pennsylvania, residing at 119 West Saint

      Joseph Street, Easton, Pennsylvania. At all times relevant hereto Plaintiff

      Welsh and Plaintiff Davis were husband and wife, having been lawfully

      married on June 22, 1991.

7.    Defendant Linda Male (hereinafter "Male") is an adult individual and

      resident of the Commonwealth of Pennsylvania. At all times relevant

      hereto, Male has served as Assistant Treasurer of the City of Easton, and is

      responsible for the day to day operation and supervision of the Treasurer's

4

Office, and the formulation and/or implementation of policies and procedures for said office, including overseeing and command and control of said office.  Additionally, Defendant Male has served as the de-facto Assistant Controller of the City of Easton, in that Male routinely serves in the stead of the Controller when the Controller is absent from the City.  At such times Male takes direction in the performance of the duties of the Controller, including affixing the Controller's facsimile signature to checks and other legal documents, from the Controller usually through telephonic direction.  In both capacities, Defendant Male, at all times relevant hereto, was acting within the scope of her duties and authority, under color or title of state or municipal public law or ordinance and supervised or controlled one or more of the other Defendants herein in their conduct or actions, or acted in concert with them in the performance of their conduct or actions, or acted independently.

8.    Defendant Michael P. McFadden (hereinafter "McFadden") is an adult individual and resident of the Commonwealth of Pennsylvania.  Until January 5, 2004, McFadden served as Business Administrator and EEO Officer, and was responsible for the day to day operation and supervision of the Department of Administration, and the formulation and/or

5

implementation of policies and procedures for said Department, including

overseeing and command and control of said Department.  Additionally,

Defendant McFadden, in his capacity as EEO Officer was responsible for

the implementation of a series of non-discrimination and anti-harassment

policies of the City of Easton.  McFadden also, additionally, served as

Mayor of the City of Easton from April 2003 until January 5, 2004.   As

Mayor, McFadden was responsible for the day to day operation and

supervision of all administrative departments of the City of Easton,

including the formulation and/or implementation of policies and procedures

for the administrative departments, including overseeing and command and

control of all such departments.  In all of his  capacities, Defendant

McFadden, at all times relevant hereto, was acting within the scope of his

duties and authority, under color or title of state or municipal public law or

ordinance and supervised or controlled one or more of the other Defendants

herein in their conduct or actions, or acted in concert with them in the

performance of their conduct or actions, or acted independently.

9.    Defendants Timothy D. Pickel, Daniel Corpora, and Burns Bamford

(hereinafter "Pickel," "Corpora," and "Bamford," respectively) are adult

individuals and residents of the Commonwealth of Pennsylvania.  Until

6

January 5, 2004, all three served as members of Easton City Council.

10.   Defendants Michael Fleck and Sandra Vulcano (hereinafter "Michael
      Fleck," and "Vulcano," respectively) are adult individuals and residents of
      the Commonwealth of Pennsylvania.  From January, 2002 until the present
      time both have served as members of Easton City Council.

11.   The aforesaid Defendants Pickel, Corpora, Bamford, Michael Fleck, and
      Vulcano  are or were responsible for the legislative functions of the City of
      Easton as defined by the Third Class City Code and The Optional Charter
      Law for a "Mayor-Council, Plan A" form of government.  Additionally, as
      City employees, the five defendants were subject to, and responsible to see
      that the provisions of the city's non-discrimination and anti-harassment
      policies were faithfully executed.   In addition to their legislative duties, the
      said five defendants, from time to time, administratively directed the work
      of Plaintiff Welsh.  All five defendants, at all times relevant hereto, were
      acting within the scope of her duties and authority, under color or title of
      state or municipal public law or ordinance and supervised or controlled one
      or more of the other Defendants herein in their conduct or actions, or acted
      in concert with them in the performance of their conduct or actions, or acted
      independently.

7

12.   Defendant Mayor Philip B. Mitman (hereinafter "Mitman") is an adult

       individual and resident of the Commonwealth of Pennsylvania, who

       currently serves as Mayor of the City of Easton, having taken office on

       January 5, 2004.  During calendar year 2003, Defendant Mitman was a

       candidate for Mayor, becoming the Republican nominee in the Primary

       Election, and Mayor-Elect in the General Election.  As Mayor, Mitman is

       responsible for the day to day operation and supervision of all

       administrative departments of the City of Easton, including the formulation

       and/or implementation of policies and procedures for the administrative

       departments, including overseeing and command and control of all such

       departments.  Defendant Mitman, at all times relevant hereto, was acting

       within the scope of his duties and authority, under color or title of state or

       municipal public law or ordinance and supervised or controlled one or more

       of the other Defendants herein in their conduct or actions, or acted in

       concert with them in the performance of their conduct or actions, or acted

       independently.

13.   Defendant Stuart Gallaher (hereinafter "Gallaher") is an adult individual

       and resident of the Commonwealth of Pennsylvania.  Since January 5, 2004

       Gallaher has served as Chief of Staff of the City of Easton.  As such,

8

Gallaher has exercised broad ranging powers including responsibility for

the day to day operation and supervision of all administrative departments

of the City of Easton, including the formulation and/or implementation of

policies and procedures for the administrative departments, including

overseeing and command and control of all such departments.  Defendant

Gallaher has also,  from time to time, Plaintiffs believe without lawful

authority, held himself out as "Acting Mayor"  of the City of Easton during

which time Plaintiffs believe he exercises all of the powers of the Office of

Mayor.  Prior to early January, 2001 Gallaher served as Assistant Business

Administrator of the City of Easton.  From early January, 2001 until January

5, 2004, Gallaher had no role with the City of Easton, being neither an

employee or consultant to the City.   Defendant Gallaher, at all times

relevant hereto, was acting within the scope of his duties and authority,

under color or title of state or municipal public law or ordinance and

supervised or controlled one or more of the other Defendants herein in their

conduct or actions, or acted in concert with them in the performance of their

conduct or actions, or acted independently.

14.   Defendant William K. Murphy, Esquire (hereinafter "Murphy")  is an adult

individual and resident of the Commonwealth of Pennsylvania. At all times

9

relevant hereto Murphy served as Solicitor to the City of Easton.  As

Solicitor, Murphy had general responsibility to see that all components of

Easton city government fulfilled their functions in a manner which was

consistent with the constitutions and laws of the United States and the

Commonwealth of Pennsylvania, as well as all local laws, regulations and

policies.  As a City employee, Murphy was subject to, and responsible to see

that the provisions of the city's non-discrimination and anti-harassment

policies were faithfully executed. Defendant Murphy, at all times relevant

hereto, was acting within the scope of his duties and authority, under color

or title of state or municipal public law or ordinance and supervised or

controlled one or more of the other Defendants herein in their conduct or

actions, or acted in concert with them in the performance of their conduct or

actions, or acted independently.

15.     Defendant Howard White (hereinafter "White") is an adult individual and

resident of the Commonwealth of Pennsylvania.  At all times relevant

hereto, White has been employed as a Revenue Agent of the City of Easton.

From January 31, 2001 through December 31, 2002, White's work was

partially supervised by Plaintiff Welsh.  White also served in various

capacities as a official of Local 447 of the American Federation of State,

10

County, and Municipal Employees Union.  As an AFSCME 447 official,
White had reason to know the contents of the City's nondiscrimination and
anti-harassment policies.  Defendant White, at all times relevant hereto, was
acting within the scope of his duties and authority, under color or title of
state or municipal public law or ordinance and supervised or controlled one
or more of the other Defendants herein in their conduct or actions, or acted
in concert with them in the performance of their conduct or actions, or acted
independently.

16.    Defendant David Fleck (hereinafter "David Fleck") is an adult individual
residing in the Commonwealth of Pennsylvania.  At all times relevant hereto
David Fleck served as Treasurer of the City of Easton.  As Treasurer, David
Fleck is responsible for the day to day operation and supervision of the
Treasurer's Office, and the formulation and/or implementation of policies
and procedures for said office, including overseeing and command and
control of said office.  As a City employee, David Fleck was subject to, and
responsible to see that the provisions of the city's non-discrimination and
anti-harassment policies were faithfully executed.  In the conduct of his
duties, David Fleck supervised Defendants Male and White.  Defendant
David Fleck, at all times relevant hereto, was acting within the scope of his

11

duties and authority, under color or title of state or municipal public law or

ordinance and supervised or controlled one or more of the other Defendants

herein in their conduct or actions, or acted in concert with them in the

performance of their conduct or actions, or acted independently.

17.    Defendant Robert Willever (hereinafter "Willever") is an adult individual

residing in the Commonwealth of Pennsylvania.  At all times relevant hereto

Willever served as Controller of the City of Easton.  As Controller, Willever

is responsible for the day to day operation and supervision of the

Controller's Office, and the formulation and/or implementation of policies

and procedures for said office, including overseeing and command and

control of said office. As a City employee, Willever was subject to, and

responsible to see that the provisions of the city's non-discrimination and

anti-harassment policies were faithfully executed.   In the conduct of his

duties, Willever supervised, from time to time, Defendant Male, in her

capacity as de-facto Assistant Controller.  Defendant Willever, at all times

relevant hereto, was acting within the scope of his duties and authority,

under color or title of state or municipal public law or ordinance and

supervised or controlled one or more of the other Defendants herein in their

conduct or actions, or acted in concert with them in the performance  of

12

their conduct or actions, or acted independently.

18.   Defendant Kenneth Snyder, Sr. (hereinafter "Snyder, Sr.") is an adult

individual, residing in the Commonwealth of Pennsylvania.  Defendant

Snyder, Sr. is a retired city employee and close associate of Defendants

Male and Bamford.  Snyder, Sr. routinely appeared at City Hall several

times per week, always spending time in the secured area of the Treasurer's

Office meeting with Defendant Male.  At all times relevant hereto,

Defendant Snyder, Sr. acted under color of state law by wilfully

participating with one of more of the other Defendants herein, who,

themselves, were acting under color or title of state or municipal public law

or ordinance  in their conduct or actions, or acted independently.

19.   Defendant City of Easton (hereinafter "Easton") is a municipal corporation

or governmental entity within the Commonwealth of Pennsylvania

operating under the Third Class City Code and Optional Charter Law of the

Commonwealth of Pennsylvania, and organized as a "Mayor-Council, Plan

A" form of government.

20.   At all times relevant hereto, Defendant Easton acted by and/or failed to act

by and through the conduct of its officers, managers, agents, representatives,

officials,  and employees, including, but not limited to, Defendants Male,

13

McFadden, Pickel, Vulcano, Michael Fleck, Corpora, Bamford, Mitman, Gallaher, Murphy, White, David Fleck, and Willever, all acting within the scope and course of their employment.

21.   At all relevant times herein, the Defendants, acting intentionally, exercised their authority in concert with their subordinates with the aim of injuring the Plaintiffs in the manner and by the means of acts or omissions more fully set out hereinafter.

22.   Said Defendants had knowledge of their subordinates' activities, gave their consent to and frequently actually directed and supervised the performance of the wrongful acts.

23.   Said defendants also condoned, encouraged and otherwise perpetuated their subordinates wrongful acts and unconstitutional acts.

Facts Giving Rise to the Action

24.   Plaintiff Welsh was employed by the Defendant City of Easton from January 31, 2001 through January 2, 2004 as Assistant Business Administrator (hereinafter "ABA").   Prior to that time Plaintiff Welsh had, from time to time, performed consulting work for Easton in the fields of information technology and government administration.

25.   As Assistant Business Administrator, Welsh was responsible for the billing

14

and collection of over ten million dollars annually through several revenue streams, the largest of which was utility fee revenue. In addition, Welsh was asked to provide planning and operations support to Data Processing, served as liaison to the Solicitor's Office and outside counsel on numerous legal matters, and assisted the Personnel Department in various issues as assigned by the Mayor.

26.   On a consulting basis prior to becoming a city employee and as ABA, Welsh was instrumental in implementing a policy initiative to reduce utility delinquencies. By June, 2000 delinquencies had risen to 3.2 million dollars, or approximately one-half of the annual billings at that time. By the time of his unlawful termination from the City, Welsh had reduced the delinquencies to slightly more than one million dollars, the bulk of which was in bankruptcy or otherwise uncollectible.

27.   Upon information and belief, in the two years since Welsh's unlawful termination, utility delinquencies have risen to well in excess of three million dollars, as no one has adequately performed the functions previously performed by Welsh.

28.   As part of the 2006 budget process, the current city administration, principally Defendants Mitman and Gallaher, advocated for both a full-time

15

and part-time employee to perform the revenue functions previously
performed, as a part of his duties, by Welsh.

The Utility Delinquency Initiative

29.    In July 2000 then Mayor Thomas Goldsmith announced a utility
       delinquency initiative which included termination of service to non-
       bankrupt owner occupied properties, and liens and execution upon liens for
       tenant occupied properties.

30.    Defendant Gallaher and Mayor Goldsmith openly clashed about the
       delinquency initiative.  Gallaher was subsequently terminated from city
       employment.  Welsh eventually replaced Gallaher as "ABA".

31.    From its inception through August, 2001, then-members of Easton City
       Council including Defendants Corpora, Bamford and Pickel, were
       extremely supportive of the delinquency initiative, even though Council had
       serious disagreements with the Goldsmith administration on most issues.

32.    On August 16, 2001, Defendant Welsh, as part of his weekly posting of
       delinquent properties, caused a service termination notice to be posted on a
       property which was 300 dollars delinquent.  The property was owned by a
       business client of Defendant Willever, who ran a financial consulting
       business.

16

33.     Defendant Willlever immediately complained to Welsh's ultimate superior,

        Mayor Goldsmith, in an attempt to interfere, on behalf of his private

        business client, with Welsh performing his assigned duties, referring to

        Welsh as the "Water Gestapo."

34.     Upon information and belief, Defendant Willever also complained about his

        private client being posted to his close personal friend Defendant Bamford.

        Defendants Bamford and Willever routinely referred to each other as

        "Butch" and "Sundance," as in "Butch Cassidy and the Sundance Kid"

        indicating that they worked closely together on city issues.

35.     Mayor Goldsmith rejected Willever's attempted interference, and stated that

        Welsh was simply doing his job.

36.     Defendant Bamford at a subsequent Council meeting in August, 2001

        attacked Welsh for posting Willever's client and stated that such things

        would not happen if Welsh would implement monthly utility billing.

The City Computer System

37.     In the mid-1990s, against Welsh's advice, the city moved from an in-house

        computer programming model to package software provided by

        Pentamation Enterprises.

38.     Implementation of the Pentamation software, especially the utility billing

17

software, was problematic due to inadequacies in the software, and

Defendant McFadden's refusal to recognize the deficiencies and instead

blame the problems on female city staff.

39. In or about March, 1999, then Easton Treasurer John McGraw asked Welsh,

as a consultant,  to review utility bills produced by the Pentamation system.

Welsh clashed with Defendant McFadden and demanded that the bills not

be sent due to errors on a substantial number of bills, including order of

magnitude errors.  Defendant McFadden was of the opinion that the bills be

sent even though they were erroneous.

40. In or about 1999 and until March 27, 2002, members of Easton City Council

repeatedly and routinely made comments critical of the Pentamation

software, including one occasion when Defendant Pickel accused Welsh of

being "too soft" on Pentamation.

The Huegel Lawsuit

41. Shortly after the beginning of the utility delinquency program several

ratepayers brought a federal civil rights lawsuit against Easton in the

Eastern District of Pennsylvania docketed at 00-CV-5077, alleging the

program to violate various constitutional and statutory provisions, including

ratepayers due process rights.

18

42.  Plaintiff Welsh, both as a consultant and, later, as ABA, was instrumental in
     ensuring that the delinquency program was lawfully implemented and was
     the administration's liaison to Mongomery, McCracken, Walker and
     Rhoads, defense counsel in the Huegel suit.

43.  As a result of Welsh's work with Attorneys David McMain and Charles
     Sweedler, the City successfully defended itself from a Preliminary
     injunction, class certification, and was granted summary judgment  on most
     claims.

44.  During the course of the litigation, Welsh believed that certain false and
     reckless comments publicly made by City Council member Bamford,
     referred to in Paragraph 36, herein above, could adversely affect the City in
     the Huegel litigation.

45.  Plaintiff Welsh requested, and was granted an executive session with
     Council to discuss the said issue, originally scheduled for September 11,
     2001, but held later in the month.

46.  At the start of the executive session, Defendant Murphy ruled that the
     session could not be held because the only proper subject regarding Huegel
     which could be discussed in executive session was a firm settlement offer.

19

Plaintiff Welsh's Defense of Michelle Thom

47.   Michelle Thom is a latina.  Ms. Thom's husband is of Panamanian descent,
      mistakenly believed by many Easton employees, including numerous of the
      Defendants to this action, to be African American.

48.   At all times relevant hereto, Michelle Thom, was employed by Easton,
      working in the Personnel Department.  In late 1999 - early 2000, Michelle
      Thom's duties greatly increased with her being given the duties of payroll
      processing and benefits administration.

49.   On or about November 15, 2000, Ms. Thom's immediate supervisor,
      Patricia Glory, Personnel Director, recommended to Mayor Goldsmith that
      Ms. Thom's salary be increased above that of an executive secretary, and
      that a new secretary position be created to allow Ms. Thom to focus on her
      new responsibilities.

50.   In the course of learning her new responsibilities, Ms. Thom worked
      substantial overtime, and was assured by Defendant McFadden that her pay
      would be increased if she mastered the new tasks.

51.   Despite the assurances made to Ms. Thom, and the fact that Defendant
      McFadden was the EEO Officer for Easton, Defendant McFadden
      misrepresented to Mayor Goldsmith the contents of Ms. Glory's memo as

20

Ms. Glory simply complaining that she wanted another secretary.

McFadden never disclosed to the Mayor the request for a raise for Ms.

Thom.

The Team-IS Proposal

52.     On or about October 29, 2001, in response to Council's interest in monthly

utility billing, feigned or otherwise, Plaintiff Welsh incorporated a proposal

to accomplish said task in a series of recommendations to Mayor Goldsmith

for revenue enhancement.

53.     On or about February 13, 2002, Welsh appeared before City Council and

detailed three proposals to accomplish monthly billing and upgrade the

city's information systems: (1) buy enhanced Pentamation software; (2) buy

software from another vendor, Eden Systems; or (3) return to an in-house

model, under a proposal called "Team-IS" which only required creating one

new position, Information Systems Design Assistant.  Council members

made it clear that they were not interested in spending any more money on

Pentamation software, but were interested in the Team-IS approach.

54.     On or about March 13, 2002, Welsh appeared before Council again, and,

with the approval of Mayor Goldsmith, presented the administration's

recommendation, the "Team-IS" proposal.

21

55. The Administrative Code of Easton provides that existing city employees
    are to be given preference in filling positions.

56. In the course of the March 13 Council meeting, Defendant Michael Fleck,
    asked if the ISDA position should be advertised for equal employment
    opportunity reasons.  Plaintiff Welsh responded that the person he had
    recommended to the Mayor was a female minority.  Michael Fleck later
    deduced that the person was Michelle Thom.

57. Upon information and belief, by the March 27, 2002 Council meeting all
    Council members knew that Michelle Thom was the person being
    considered for the ISDA position.

58. During the March 27 Council meeting Defendant Bamford reversed himself
    and voiced support for Pentamation, blaming female city staff for not being
    able to understand it, and stating erroneously that the City of Meadville
    accomplished monthly utility billing with Pentamation software.  In fact,
    utility billing was turned over to the Meadville Water Authority because the
    Pentamation software could not accomplish monthly billing.

59. At the said March 27 meeting, Defendants Pickel and Corpora stated that
    they would not approve the ISDA position job description, despite the fact
    that Defendant Murphy had previously ruled that Council could not approve

22

job descriptions.

60. In early April 2002, Plaintiff Welsh met with Defendants Pickel and Corpora to advocate for the ISDA position. Welsh presented a revised job description including an associate degree requirement. Welsh told the said Defendants that Michelle Thom was planning to complete an Associates Degree in Accounting. Defendant Corpora remarkably stated that Accounting had nothing to do with financial information systems, and that he wished he did not know that a minority employee was being considered, but he could "fix" that by using a firm that recruits minority applicants.

61. The Team-IS proposal was never acted upon by City Council.

62. Upon information and belief, Defendant McFadden and one or more of the other Defendants advocated against the establishment of the ISDA position because of a discriminatory animus toward Michelle Thom.

63. Michelle Thom subsequently informed both Plaintiff Welsh and Mayor Goldsmith that she believed that City Council did not act on the said proposal because of her race, gender, or their mistaken belief that her husband was African American. Plaintiff Welsh subsequently informed Mayor Goldsmith that he agreed with Ms. Thom's assessment.

64. During the balance of 2002 Plaintiff Welsh and Defendant McFadden

23

repeatedly clashed over Council's decision regarding Michelle Thom.

McFadden repeatedly stated that Council members "did not like" Michelle.

Plaintiff Welsh repeatedly stated to numerous Easton officials that he would

not be a party to any alternative information systems plan which would be a

mere pretext to deny minority employee advancement.

The Kenneth Snyder, Jr. Incident

65.   Kenneth Snyder, Jr., son of Defendant Kenneth Snyder, Sr., was employed

by Easton for numerous years including part of 2002.

66.   On or about July 19, 2002, Kenneth Snyder, Jr. was on light duty and

assigned to assist the Business Privilege Tax office, supervised by Welsh.

67.   Welsh objected to both the Mayor's office and the Personnel Department

that he did not want Snyder, Jr. to be handling confidential Act 511 tax

information.  Welsh knew that Snyder, Jr. was the subject of an ongoing

investigation into drug dealing and that a city policy limiting personal use of

cell phones was not implemented in order to facilitate the police

investigation.

68.   Upon information and belief, Welsh's objections to Snyder, Jr. being in the

tax office were told to Defendant Kenneth Snyder, Sr.

69.    Snyder, Jr. was subsequently arrested by the Pennsylvania State Police for

24

arranging a cocaine purchase while at work on July 19, 2002.

70.  Sometime after Snyder, Jr.'s arrest the utility billing staff, under Welsh's supervision,  read the water meter at Snyder, Jr.'s residence as part of their routine quarterly reads.  The meter indicated consumption of negative three units.

71.  Welsh and his staff surmised that the only explanation for the reading was that Snyder, Jr., a former meter reader, knew that if he reversed his meter early in a reading period and then switched it back, the meter would report lower consumption.  Snyder, Jr. was unable to switch the meter back because he was incarcerated.

72.  Welsh reported the said matter to Mayor Goldsmith who instructed him to assist the Easton Police Department in obtaining a search warrant.  The warrant was subsequently obtained.

73.  Defendant Snyder, Sr. was present when the warrant was executed, and later went to City Hall to meet with his close personal friend, Defendant Male.

74.  Defendant Male loudly criticized Plaintiff Welsh for seeking the warrant.

75.  Upon information and belief, Defendant Snyder reported the incident to Defendant Bamford, who was Snyder's gambling partner.  The two frequented "The Downs" off track betting parlor.  Defendant Snyder

25

bragged that he knew certain races were fixed and gave this information to Bamford, as well as arranging for third parties to cash Bamford's winning tickets.

76. Defendant Snyder bore personal animus toward Plaintiff Welsh because of the incidents involving his son, Welsh's participation with the Personnel Department in processing his son's termination, as well as the earlier termination of another Snyder, Sr. relative, Nicole Zarate.

The 2002 Budget Season

77. During the preparation of the 2003 budget, Plaintiff Welsh again advocated for the ISDA position. It was not included in the proposed budget due to a lack of support on Council.

78. Defendant Treasurer David Fleck, in concert with Defendant Council Member Michael Fleck, proposed that Defendant Linda Male assume supervision and control of all of Plaintiff Welsh's staff, in an effort to eliminate Welsh's ABA position.

79. Two members of Welsh's staff, Utility Billing Technicians Doris Mendisana and Laurel Rowe appeared at a Council budget session and spoke vehemently against being placed under the control of the Assistant Treasurer Male.

26

80.    Rowe, who had previously worked in the Treasurer's Office, described a
       racially hostile atmosphere promoted in that Office by Defendant Male,
       including comments about taxpayers race or ethnic background made by
       Male and frequent Male visitor Russell Border, Supervisor of the City
       Motors Bureau,  as they came to the Treasurer's Office to pay their city
       obligations.

81.    Upon information and belief, Russell Border had been previously
       disciplined for repeatedly referring to a subordinate as "N - - - - - Charlie."

82.    In their presentation to Council, Mendisana and Rowe were repeatedly
       interrupted by Defendant Pickel who tried to disrupt their presentation
       because it was critical of his ally, Defendant Male.

83.    Plaintiff Welsh defended Mendisana and Rowe's right to speak, and was
       later falsely accused by Defendant Male to Mayor Goldsmith of having
       prepared their statements

84.    Defendant Male also routinely referred to Michelle Thom as "the black
       princess," a disparaging reference to Ms. Thom's husband's skin color.
       Plaintiff Welsh relayed this information to Mayor Goldsmith and to EEO
       Officer Defendant McFadden.

85.    During the budget process, Defendant McFadden informed Plaintiff Welsh

27

in the presence of Mayor Goldsmith, that Defendant Bamford stated that there were five votes on Council to eliminate Plaintiff Welsh's ABA position.

86.  Mayor Goldsmith appeared before Council in support of Plaintiff Welsh and launched a scathing attack on the operation of the Treasurer's Office, including securing a public admission from Defendant David Fleck, that due to the demands of his private accounting business, he was available only on an emergency basis until April 15 of each year.

87.  In light of the revelations brought forth by the Mayor, Council decided not to move Plaintiff Welsh's staff to the Treasurer's Office.

88.  Council passed two resolutions administratively directing Welsh's work, to wit: (1) that Welsh individually report his revenues monthly to Council, even though Council received a report from the Business Administrator; and (2) that Welsh create a database of all dwelling units in the city, which Welsh had previously identified as the keystone to an in-house revenue information system.

89.  When Council passed the said resolutions it had no lawful authority under the Pennsylvania Third Class City Code and Optional Charter Law to administratively direct Welsh's work.  Defendant Corpora informed Welsh

28

that his compliance with the resolutions would determine if his position

would be funded in future years.

The 2003 Primary Election Season

90.    Defendant Mitman defeated Steve Humphrey for the Republican nomination

for Mayor.  Humphrey subsequently was active in the general election on

behalf of Mitman, and was subsequently named Business Adminstrator by

Mitman.

91.    Defendant Corpora, William Houston, a former member of Easton Council,

and Defendant Michael Fleck were candidates for Mayor in the Democratic

Primary of 2003.

92.    Plaintiffs assisted both Corpora and Houston preferring either candidate to

Defendant Michael Fleck.

93.    Corpora ultimately was elected Democratic nominee for Mayor.

The Treasurer's "Reorganization" Plan

94.    Shortly after Defendant Michael Fleck's defeat in the Democratic Primary,

Defendant David Fleck appeared before Easton City Council and demanded

that he be given control of Welsh's staff, arguing that, as Treasurer, he was

required to collect all revenue.

95.    Notwithstanding David Fleck's assertion that he was required to collect all

29

revenue, when Welsh pointed out that his proposal ignored significant

revenue such as parking tickets and code fees, David Fleck responded that

he was "not going to go to that extreme." David Fleck's response

demonstrated that his true motivation was to deprive Welsh of his staff, and

ultimately his position.

96.   Defendant David Fleck claimed that the purpose of his plan was not to

terminate Welsh's employment, but rather to free up more of his time to

work on information systems issues.

97.   Plaintiff Welsh, upon questioning by the media, responded that he believed

the "reorganization" plan to be clearly in retaliation for Welsh's opposition

to David Fleck' s son Michael Fleck's failed candidacy, and other issues

which involved personnel matters.

98.   Following publication of a newspaper article the following morning,

Plaintiff Welsh received an angry telephone call from Defendant Michael

Fleck in which Fleck stated, inter alia, that Defendant Pickel would be

coming to City Hall later in the day to "straighten you out."

99.   Later that morning Pickel confronted Welsh, in front of subordinates, and

loudly ridiculed him for "stupid ass comments" in the press and accused him

of perjury in the Huegel case. Welsh asked Pickel to cite the page and line

30

which was untrue.  To the present day neither Pickel nor anyone else has

done so.

Welsh's Defense of Marcus Gilbert

100.   Marcus Gilbert is an African American employee of Easton.  At all times

relevant hereto, he was employed as a clerk.

101.   Prior to 2003, Mr. Gilbert was assigned to the Treasurer's Office, where

Defendant Male assigned only menial tasks to Mr. Gilbert.

102.   At the beginning of 2003, Mr. Gilbert was reassigned to the ABA office,

working under the supervision of Plaintiff Welsh.

103.   Plaintiff Welsh assigned Mr. Gilbert to provide clerical support to the

Business Privilege Tax office, and to compile data from the code

enforcement office in support of the development of the housing database

requested by Council.

104.   Mr Welsh completed the database compiling it into a state of the art

Geographic Information System which could serve a the keystone for a

revamped revenue information system.  A neighboring municipality

subsequently spent in excess of $700,000 to develop such a system.

105.   The database was presented to Council in September, 2003.  During the

presentation Defendants Bamford and Pickel became so loud in a side

31

conversation, that Plaintiff Welsh was forced to interrupt his presentation.

106.  Despite Council having passed an extraordinary resolution demanding such
      a system, not one member of council ever contacted Welsh in an effort to
      utilize the system.

107.  Welsh did utilize the database to launch an initiative to collect Business
      Privilege Tax from landlords.  Mr. Gilbert was instrumental in support of
      the program, and became the subject of an increasingly belligerent attitude
      by the Business Privilege Tax Officer, Edward Joseph.

108.  Mr. Welsh was forced to take disciplinary action against Mr. Joseph due to
      his comments denigrating Mr. Gilbert's abilities made in front of city
      taxpayers.

109.  Defendant Bamford publicly stated that in deciding to terminate Mr.
      Welsh's employment he sought advice from Mr. Joseph.  Defendant
      Bamford did not contact Mr. Welsh.  If he had done so, Defendant Bamford
      would have learned of the disciplinary action against Mr. Joseph.

110.  On or about October 22, 2003, Mr. Joseph suffered a medical event
      requiring immediate hospitalization.  Prior to and while emergency
      personnel were attending to Mr. Joseph, Defendants Male and Pickel loudly
      opined in front of other City workers that Plaintiff Welsh was responsible

32

for Mr. Joseph's medical problems.

111.  Defendant Pickel instructed several of Welsh's staff members to "keep Joe away from" Mr. Joseph, a direct subordinate of Welsh.

112.  Throughout 2003, Defendants Male and David Fleck repeatedly demanded that Mr. Gilbert collect parking meter coins, instead of the intellectually challenging work which Mr. Welsh assigned.  Mr.Welsh opposed all such attempts.

113.  Mr. Gilbert informed Mr. Welsh that he believed he had only been assigned menial tasks by the Treasurer's Office because he was African American.

Defendant Male's Plan to Get Welsh

114.  In or about February, 2003, Defendant Male organized a secret meeting among herself, Defendant David Fleck, Defendant White, Richard Sabo, another Treasurer's Office employee, and Defendant Corpora.  Upon information and belief, the purpose of the meeting was to disparage Plaintiff Welsh's job performance to Defendant Corpora.

115.  Although Plaintiff Welsh was present at City Hall during the meeting, none of the participants asked him to attend, or ever asked him for his response to the discussion during the meeting.

116.  Upon information and belief, Defendant Male believed that she could

33

influence Defendant Corpora because Defendant Corpora's brother was an employee of Defendant David Fleck's accounting business.

117.   Subsequently in or about July, 2003, Defendants Male, White, and David Fleck, along with one or more of the other Defendants, organized an executive session with City Council.  Upon information and belief, the purpose of the executive session was to discuss the said Defendants' perception of Welsh's job performance.

118.   Defendant Murphy originally instructed the City Clerk to list the executive session on the agenda of City Council as a session on personnel.  Defendant Murphy subsequently instructed the Clerk to list the session as a discussion of the Huegel litigation.

119.   If the session had been listed as Defendant Murphy originally requested, Defendant Welsh would have had a right to attend the session based on a prior ruling by Defendant Murphy.

120.   The executive session was allowed to proceed on the basis of the Huegel litigation, and Defendant Murphy participated, even though, Plaintiffs believe,  the thrust of the session was personnel, namely Plaintiff Welsh.

121.   In allowing the executive session to be based on the Huegel litigation, Defendant Murphy contradicted his earlier ruling that Plaintiff Welsh could

34

not discuss matters collateral to the <u>Huegel</u> litigation in executive session (See ¶ 46, supra).

122. In or about November, 2003, Defendants David Fleck and Male appeared before City Council and, once again, advocated for all of Plaintiff Welsh's staff being placed under their control.  Unlike their prior presentation (See ¶¶ 94 - 96, supra) they incorporated the cost savings from eliminating Welsh's ABA position into their analysis, thus revealing their true motivation.

123. Upon information and belief, Defendant Male manipulated City Council through the following means:

1. Control of Defendant Corpora through his brother's employment by Defendant David Fleck,

2. Control of Defendant Michael Fleck through his father Defendant David Fleck,

3. Control of Defendant Pickel through her close association with him,

4. Control of Defendant Bamford through Defendant Snyder, Sr. and Defendant Willever.

124. Defendant Male knew that Defendant Vulcano harbored ill will toward Welsh because of his support for Mayor Goldsmith in 1999, against her

35

husband, Pat Vulcano, Jr. in the Mayor's election.

The Interim Mayor Position

125.  In or about April, 2003, then Mayor Goldsmith resigned to accept an
      appointment to the Pennsylvania Liquor Control Board.

126.  By as early as late November, 2003 Defendant McFadden knew that Mayor
      Goldsmith would joining the Rendell administration in some capacity.
      Plaintiff believes that McFadden immediately began courting support on
      Council for the appointment.

127.  City Council chose Mayor Goldsmith's successor.

128.  Plaintiffs supported former Mayor Sal Panto, Jr. for the position.  The other
      main candidate was Defendant McFadden.

129.  City Council, by a three to two vote, selected Defendant McFadden to be
      Interim Mayor.

The 2003 General Election

130.  Plaintiffs publicly supported Defendant Corpora in the 2003 campaign over
      Defendant Mitman, including, inter alia, contributing money to his
      campaign committee, appearing at Corpora campaign events, and publicly
      speaking on behalf of Corpora.

131.  In or about August, 2003 Defendant Mitman publicly stated that an

36

individual who was supporting Defendant Corpora would not be considered

for the position of Business Administrator should Mitman be elected Mayor.

132. Defendant Mitman was elected Mayor in November, 2003.

133. Welsh subsequently applied for the position of Business Administrator, but

was not given any consideration for the position by Defendant Mitman.

134. Upon information and belief, Defendant Gallaher advised Defendant

Mitman not to consider Welsh because he harbored personal animosity

toward Welsh, who was his successor as ABA.

The Stealth Nondiscrimination and Anti-Harassment Policy

135. On three separate occasions, October 26, 1992, April 28, 1993, and

February 11, 2003, Easton promulgated Nondiscrimination and Anti-

Harassment Policies.

136. Although Welsh was a senior management official, and repeatedly inquired

as to the existence of such policies, he was never provided with copies of

the said policies.  The responsibility to provide such copies rested

principally with Defendant McFadden as the EEO Officer.

137.  On numerous occasions orally, and on five occasions in writing, Plaintiff

Welsh brought to the attention of senior management officials that practices

were occurring which Welsh reasonably believed violated federal and state

37

anti-discrimination laws, and that Welsh was being impermissibly harassed in retaliation for engaging in protected activities.

138. In or about July, 2003 Welsh met with Defendants Murphy and McFadden to specifically discuss such issues. Defendants Murphy and McFadden stated that Welsh was entitled to no legal protection for opposing discriminatory practices, and that Welsh should hire his own attorney. At the said meeting neither the EEO Officer/Mayor or the City Solicitor informed Welsh of the existence of the said city policies.

139. Plaintiffs believe that Defendant Murphy's refusal to enforce the City policies with respect to Plaintiff Welsh was based on ill will harbored by him as a result of, inter alia:

    a) Welsh being assigned to assist outside counsel, Jay Leeson,, in litigation designed to change the manner of appointment of the City Solicitor from a direct appointment by Council to appointment by the Mayor, with the advice and consent of Council;

    b) Welsh repeatedly advocating that Murphy's firm should reimburse the City $80,000 damages paid as a result of mishandling of the Alpha Building purchase, and Welsh's work with outside counsel, Laub, Seidel, Cohen & Hof to clean up the Alpha Building closing

38

mess;

c)      Welsh working with Portnoff Law Associates to successfully
        persuade Federal Bankruptcy Judge Tordowski to reverse his ruling
        invalidating Easton's 10 percent penalty on delinquent utility bills;

d)      Welsh requesting increased support from the Solicitor's Office in
        revenue collection matters;

e)      After Welsh's termination, Defendant Murphy took the
        unprecedented step of having himself appointed special prosecutor to
        pursue two $5.00 parking tickets against Welsh, when Murphy knew
        or should have known that the said tickets were unenforceable; and

f)      Defendant Murphy blocking a meeting between the Plaintiffs and
        Defendant Mitman, as more fully described herein after in ¶¶ 181 to
        182.

140.    On December 9, 2003 Welsh saw union copies of two of the said policies on
        a subordinate's desk.

141.    The subordinate was filing a grievance against Defendant Male under the
        policies, because she learned that Defendant Male was keeping, secret,
        unofficial personnel files on Welsh's ABA staff.

142.    Upon information and belief, no action was ever taken on the said grievance

39

filed under the purported policies.

143. Promptly on December 10, 2003, Welsh filed a formal grievance under the policies.

144. The policies provided, <u>inter alia</u>, that Welsh was entitled to a prompt investigation of his grievance, written findings within 10 days, and that no adverse action could be taken against him for filing the grievance.

145. In or about mid-December, 2003 City Council held an executive session to deal with Welsh's grievance. Although the session was called on a personnel matter, and the matter clearly involved Welsh, Welsh was not permitted to attend any portion of the session, despite a prior ruling by Solicitor Murphy that such an employee must be given the opportunity to attend the session.

146. The said executive session was attended by Defendant Gallaher. At the time Defendant Gallaher was neither an employee or consultant, nor even a resident of Easton. There was no legitimate purpose for Gallaher to be allowed to attend the executive session.

147. Welsh subsequently on December 18, 2003 appealed to Defendant Murphy stating that under city policy he could not be terminated until the grievance was investigated. Defendant Murphy did not timely respond to Welsh.

40

148.  On December 29, 2003, Welsh hand delivered a similar request to the three newly elected Council members, and included a copy of the December 18 correspondence to Murphy.

149.  Finally, on December 30, 2003, Murphy informed Welsh that, the policies of the City notwithstanding,  he would not intervene on behalf of Welsh

150.  On December 31, 2003, Defendant EEO Officer McFadden informed Welsh that he, too,  would not intervene.  McFadden did, however, authorize Welsh to work on January 2, 2004 to attempt to clear up pending city business.

151.  Easton never investigated Welsh's grievance, never provided Welsh with written findings, and, instead, terminated Welsh's employment on January 2, 2004.

152.  After Welsh's termination, Easton hired Attorney Raymond Bush to conduct an investigation, but refused to reinstate Welsh pending the results of the investigation.

153.  Welsh did not believe Bush to be an appropriate investigator because, inter alia, Bush had worked on Defendant Mitman's election campaign, Bush was a close associate of Defendant McFadden, Welsh and McFadden repeatedly disagreed about Bush's work in legal matters, and an Assistant City

41

Solicitor had earlier informed Welsh not to follow any advice that Bush

gave, because of prior dealings which that individual had with Bush.

The 2003 Budget Process

154. In or about September, 2003, Defendant McFadden, as Mayor, conducted a

series of budget hearings before the Mayor, in which Department heads

publicly presented their budget requests to the Mayor.

155. Since McFadden was serving as both Mayor and Business Administrator,

Welsh was asked to present the Department of Administration's proposals.

156. Welsh's presentation was repeatedly interrupted and ridiculed by Defendant

Pickel, who informed another City employee that he "just loves yelling at

Joe Welsh."

157. At a subsequent budget session, Defendant Pickel vowed, in front of City

employees and the news media that he was going to "get" Joe Welsh.

158. On or about November 24, 2003,  City Council's review of the Department

of Administration's budget discussion was held regarding the ABA

position.  In the course of the discussion Defendant Michael Fleck indicated

that Defendant Mitman was developing a new staffing plan for the

Department.  Defendant Pickel publicly stated that he would consider

keeping the ABA position in a new administration, but in the current

42

administration he would vote to "get rid of" the ABA.   No member of

Council protested Pickel's statement.

159.   Defendant Pickel's public statement clearly indicated that any claimed

budgetary rationale for eliminating the ABA position was mere pretext and

that the real intent was to "get rid of" Welsh.

160.   During the budget deliberations, Defendant Corpora approached Plaintiff

Welsh complaining of two female employees, Personnel Director Patricia

Glory and Assistant City Solicitor Beth Knickerbocker.

161.   Defendant Corpora criticized Ms. Glory for not being able to develop a

personnel manual.  Defendant Corpora based his assertion on a claim made

in the media by Defendant McFadden that the Personnel Department was

unable to complete the manual and he had to give the project to a group of

community college students in a class taught by Attorney Ray Bush.

162.   Plaintiff Welsh vehemently defended Ms. Glory, informing Defendant

Corpora that Ms. Glory had in fact completed the personnel manuals, based

on training which she had received in seminars at the Philadelphia law firm

Reed Smith, labor counsel to Easton.

163.   Defendant Corpora also criticized the female Assistant City Solicitor Beth

Knickerbocker saying that he had been told that she was just "fluff."

43

Plaintiffs believe that Defendant Corpora had been told this by Defendant McFadden.

164.   Plaintiff Welsh defended Attorney Knickerbocker's work, as she had spent most of her time working with Welsh on revenue collection issues.  Welsh informed Corpora that he resented the use of the word "fluff" to describe any female employee, as a theoretically superfluous male employee would not be so described.

165.   As had been his practice, Welsh diligently attended all budget sessions of City Council.  During one session, Welsh informed Council that he needed to leave early because his son, Jack, was receiving an award from the Easton Area School Board for having the highest standardized reading test score in his school.  It was during the only two hours which Welsh was not present that Council decided to take a "preliminary" vote to eliminate the ABA position without seeking Welsh's input.

The Huegel Settlement

166.   In or about November, 2003, Plaintiff Welsh met in executive session with Easton City Council to discuss a potential settlement of the Huegel litigation.  Welsh believed the proposed settlement would be highly detrimental to the City's utility delinquency program.  At least three

44

members of Council agreed.

167. Welsh told Defendant Corpora that he believed Council should consider authorizing the ABA position for part of year 2004 so that a reasonable settlement of the Huegel litigation could be worked out.

168. Subsequently, Council held a second executive session, excluded Welsh from participating and voted 5 -0 to accept the settlement.

169. As part of the settlement, Easton represented to the Court that it would establish an appeals board to hear cases involving utility service terminations.  To date, such a board has not been established, indicating that the rush to settlement was just another part of the plan to eliminate Welsh's employment at any cost.

Ignoring the City's Own Ordinance

170. The Administrative Code of the City of Easton establishes a procedure for the elimination of positions, which includes, inter alia, a written job analysis form and the approval of the Department head.

171. The procedure prescribed by City Ordinance was not followed in the rush to eliminate Welsh's ABA position.

172. Had such an analysis been conducted, City Council would have, ironically, documented the essential nature of the Welsh's position, in much the same

45

manner that then-Mayor Goldsmith did the during the prior budget season.

Community Context

173.   In addition to items directly within his duties, Plaintiff Welsh also spoke in

the presence of numerous of the Defendants on matters of general interest in

the community, including, <u>inter alia,</u>

   a)   Appearing before Northampton County Council to call for the

      removal of Councilman Ron Angle from all leadership

      positions after he opined on his private talk radio program that

      everyone on welfare should be shipped back to Africa.  Angle

      allied himself with numerous of the Defendants herein in their

      successful quest to remove an African American (then

      President of the Easton NAACP)  and a female from their paid

      positions with the City's Weed and Seed program;

   b)   Supporting the continued allocation of CDBG money to the

      predominantly African American Shiloh Baptist Church

      housing rehab project, instead of diverting the money to an out

      of town organization

174.   Both Defendants Corpora, the Council liaison to Plaintiff Welsh's

Department, and Defendant McFadden, the EEO Officer for Easton,

46

belonged to a racially exclusive, private club in Easton.

Post Termination Retaliation

175. After Welsh's unlawful termination, his utility billing staff was directed by Business Administrator Steve Humphrey not to allow Welsh into their office, although other former employees routinely were, and to be careful about speaking to Welsh.

176. When Welsh's staff pointed out that Kenneth Snyder, Jr., a former employee, had just been in their office, Humphrey responded "this is about Joe Welsh." He further stated that an unnamed member of Council demanded that he give these instructions to the utility billing staff.

177. In or about January, 2004, Plaintiff Welsh offered to walk Humphrey through the database which he and Marcus Gilbert had developed. Humphrey was receptive to the idea, but said he needed to check with his superiors. Humphrey never contacted Welsh to review his work.

178. Defendant Murphy had himself appointed special prosecutor to pursue two $5.00 parking tickets against Plaintiffs. While Welsh was ABA he had asked that one of the solicitors be appointed prosecutor to recover tens of thousands of dollars in bad checks which had been ignored by the Treasurer's Office. Defendant Murphy flatly refused, telling Welsh that he

47

did not, as a matter of policy, allow such appointments.

179.  After Welsh filed his Complaint with the Pennsylvania Human Relations
      Commission, Defendant Murphy demanded that Welsh remove his personal
      property from the ABA office.  Welsh informed the staff at City Hall that
      his attorney was a delegate to the Democratic National Convention, and he
      would seek his advice upon his return several days later.  Rather than grant
      the courtesy, city officials hurriedly packed Welsh's private property and,
      within two hours, delivered it, some in damaged condition, to his home.

180.  Easton unlawfully terminated Welsh's family's COBRA continuation health
      benefits.  Upon information and belief, Defendant Gallaher made the
      decision to terminate Welsh's coverage.

181.  In or about December, 2004, Plaintiff Davis asked Mitman advisor Richard
      McAteer if Plaintiffs could meet with Mayor Mitman to discuss several
      personal issues involving the City as well as several matters of public
      policy.

182.  Upon information and belief, Defendant Mitman immediately and
      enthusiastically agreed to the meeting.  He later decided to consult
      Defendant Murphy.  Defendant Murphy informed Defendant Mitman that he
      could not meet with Plaintiffs because Plaintiff Welsh had filed a Complaint

48

with the Pennsylvania Human Relations Commission.

183.  The acts and/or omissions of the Defendants described herein proximately
      caused the following damages to Plaintiff Welsh:

      a)    loss of past and future income;

      b)    diminished economic horizons;

      c)    loss of esteem in the community;

      d)    physical and mental pain and suffering and anguish, embarrassment,
            and humiliation;

      e)    loss of valuable and inalienable rights guaranteed by the First and
            Fourteenth amendments to the United States Constitution, the
            Pennsylvania Constitution, and federal and state statutes;

      f)    impairment of personal and professional reputation;

      g)    additional expenses as a result of post-termination retaliation
            including un-reimbursed medical expenses.

184.  The acts and/or omissions of the Defendants described herein proximately
      caused the following damages to Plaintiff Davis:

      a)    loss of esteem in the community;

      b)    physical and mental pain and suffering and anguish, embarrassment,
            and humiliation;

49

c) loss of valuable and inalienable rights guaranteed by the First and Fourteenth amendments to the United States Constitution, the Pennsylvania Constitution, and federal and state statutes;

d) impairment of personal and professional reputation;

e) medical expenses; and

f) loss of companionship of her husband caused by the stress of his unlawful termination.

185. At all relevant times herein, the Defendants, acting intentionally, exercised their authority in concert with their subordinates with the aim of injuring the Plaintiffs in the manner and by the means of acts or omissions more fully set out hereinafter.

186. Said Defendants had knowledge of their subordinates' activities, gave their consent to and frequently actually directed and supervised the performance of the wrongful acts.

187. Said defendants also condoned, encouraged and otherwise perpetuated their subordinates wrongful acts and unconstitutional acts.

188. At all times relevant hereto the legal principles regarding the rights of the Plaintiffs were well established and it was not reasonable for the Defendants to believe that their actions would not deprive Plaintiffs of those rights.

50

189.   The actions of Defendants hereinbefore described demonstrate a policy,

practice, procedure, or custom of intentionally disregarding the statutory

and constitutional rights of Plaintiffs and others.

**COUNT I**
**Joseph E. Welsh, Plaintiff**
**v.**
**Linda Male**
**Michael P. McFadden**
**Timothy D. Pickel**
**Sandra A. Vulcano**
**Michael P. Fleck**
**Daniel Corpora**
**Burns Bamford**
**William K. Murphy, Esquire**
**Howard White**
**David Fleck**
**Robert Willever**
**Kenneth Snyder, Jr.**
**The City of Easton,**
**Defendants**

**VIOLATIONS OF 42 U.S.C. §2000e-3 AND SECTION 5(d) OF THE**
**PENNSYLVANIA HUMAN RELATIONS ACT**

190.   Paragraphs 1 through 189 inclusive, are incorporated by reference as if fully

set forth at length herein.

191.   Plaintiff Welsh reasonably believed that unlawful discriminatory practices

were occurring in Easton City government.

192.   Plaintiff Welsh repeatedly opposed practices which he reasonably believed

violated provisions of the Pennsylvania Human Relations Act ("PHRA")

51

and Title VII of the Civil Rights Act of 1964 ("Title VII"). These practices included, but were not necessarily limited to, the inequitable treatment of Michelle Thom, the attempts to inhibit the career advancement of Marcus Gilbert, the racially hostile atmosphere promoted by management in the Treasurer's Office, and the inaccurate, negative, and gender discriminatory comments about Patricia Glory, Beth Knickerbocker, Esq, and the Utility Billing Technicians.

193. Plaintiff Welsh repeatedly participated in activities designed to end practices which he reasonably believed violated provisions of the PHRA and Title VII. These activities included, but were not necessarily limited to, verbal complaints to Mayor Goldsmith and Michael McFadden, written complants to Mayor Goldsmith, Patricia Glory, Michael McFadden and Solicitor Murphy, statements to Easton City Council in the presence of Solicitor Murphy, statements to individual members of Easton City Council, support for and defense of subordinates in their statements to Easton City Council, Solicitor Murphy and other officials, and disciplinary action of a subordinate, Edward Joseph, for actions which violated the referenced acts as well as the collective bargaining agreement with AFSCME Local 447 and purported City policies.

52

194.   Plaintiff Welsh's activities were also within the scope of activities

purportedly protected by the nondiscrimination and anti-harassment policies

promulgated by Defendant Easton.

195.   The Defendants, or one or more of them, failed to provide protection to

Plaintiff Welsh for engaging in  protected activities and instead retaliated

against him for such activities.  Examples of such retaliation include, but are

not necessarily limited to, unlawfully interfering with the administration of

Welsh's office, unlawfully interfering with the supervision of Welsh's staff,

engaging in unlawful acts of hostility against Welsh, failing to take

necessary actions to prevent further hostility against Welsh and his staff,

failing to respond to Welsh's complaints regarding such illegal activity,

failing to process Welsh's timely filed formal grievance regarding such

illegal activities, failing to consider Welsh for promotion to Business

Administrator, terminating Welsh's employment in violation of City

ordinances with respect to the elimination of positions, and continuing acts

of retaliation post-termination.

196.   As a result of the within described violations of law the Defendants, or one

of more of them, have proximately caused serious damage to Plaintiff Welsh

as set forth herein above.

53

197.   The acts or omission described herein including, <u>inter alia</u>, the blatant
       refusal of the Defendants, or one or more of them, to enforce, of even
       acknowledge the existence of, Easton's nondiscrimination and anti-
       harassment policies, are outrageous and beyond the bounds of decency in a
       civilized society.  As such, punitive damages are justified against all
       defendants except Easton.

       WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable
Court award judgment in his favor and against all Defendants, jointly and
severally, in an amount in excess of the One Hundred Fifty Thousand Dollar
($150,000.00) limit for adjudication in the District Court for the Eastern District of
Pennsylvania, as well as costs and reasonable attorneys' fees.

**COUNT II**
**All  Plaintiffs**
**v.**
**All Defendants**

**<u>VIOLATIONS OF 42 U.S.C. §1983</u>**

198.   Paragraphs 1  through 197 inclusive, are incorporated by reference as if
       fully set forth at length herein.

199.   The Defendants acted in concert with each other, and all Defendants acted
       under color of law, and violated the rights of the Plaintiffs by depriving

54

them of their constitutionally protected right to free speech, to petition the

government for a redress of grievance, freedom of association, due process

and other rights as guaranteed by the First and Fourteenth Amendments to

the United States Constitution, in that Plaintiff Welsh was subjected to a

hostile workplace environment and, ultimately unlawfully terminating his

employment, and further depriving Plaintiff Davis of her right to freely

associate with her husband and her governmental leaders, and such other

deprivations as herein above described, all in violation of Plaintiffs rights

under the First and Fourteenth Amendments.

200.   The actions of all the Defendants, collectively and individually in planning,

conducting, and carrying out the action hereinbefore more fully set forth,

deprived the Plaintiffs of their Constitutional rights as guaranteed by the

First and Fourteenth Amendments to the United States Constitution, Section

8 of the Pennsylvania Constitution, and 42 U.S.C. Section 1983 in, *inter*

*alia*, the following manners:

   a.   In the unreasonable use of governmental power and authority in

        retaliating against Plaintiff Welsh;

   b.   In the intentional or negligent infliction of emotional distress upon

        the Plaintiff Welsh, designed or calculated to punish the said

55

Plaintiff;

c.    In the development, implementation and carrying out of a policy, practice, procedure or custom designed to allow the deprivation of Constitutional rights of citizens, such as the Plaintiff;

d.    In failing to develop, implement and carry out policies prescribing proper conduct of government officials in dealing with employees and the public;

e.    In developing, implementing, and carrying out a policy, practice, or procedure or custom which made no reasonable or proper provision for the protection of statutory or constitutional rights of the Plaintiffs;

f.    In failing to properly train, supervise, monitor and control the actions of all the Defendants so that the rights of persons such as the Plaintiffs would not be violated;

g.    In failing to properly develop, implement and carry out a policy, practice, or procedure or custom which conformed with the Constitutional and statutory requirements in personnel management;

h.    In demonstrating callous and deliberate indifference in failing to oversee, monitor, control, curtail, or restrain the actions of the individual Defendants in carrying out the acts hereinbefore described

56

when all Defendants knew, or should have known from prior actions
and conduct by the individual Defendants, that the likelihood of
violations and the deprivation of the constitutional rights of citizens
such as the Plaintiffs was substantial.

201. As a result of the within described violations of law the Defendants, or one
of more of them, has proximately caused serious damage to Plaintiff Welsh
as set forth herein above.

202. The acts or omission described herein are outrageous and beyond the
bounds of decency in a civilized society. As such, punitive damages are
justified against all defendants except Easton.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court
award judgment in his favor and against all Defendants, jointly and severally, in an
amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit
for adjudication in the District Court for the Eastern District of Pennsylvania, as
well as costs and reasonable attorneys' fees.

57

## COUNT III
### Joseph E. Welsh, Plaintiff
### v.
### All Defendants
### DENIAL OF EQUAL PROTECTION
### 42 U.S.C. §1983

203. Paragraphs 1 through 202 inclusive, are incorporated by reference as if fully set forth at length herein.

204. The actions of Defendants hereinbefore described demonstrate a policy, practice, procedure, or custom of intentionally treating Plaintiff Welsh in a manner different from other, similarly situated, Easton employees.

205. The disparate treatment suffered by Plaintiff Welsh was not rationally related to any legitimate governmental interest, but rather was the product of the ill will and animus of Defendants toward Plaintiff Welsh.

206. In such treatment of Plaintiff Welsh, Defendants deprived Plaintiff of the Equal Protection of law afforded to Plaintiff by the Fourteenth Amendment to the United States Constitution, Article I, §26 of the Pennsylvania Constitution, and 42 U.S.C. §1983.

207. As a result of the within described violations of law the Defendants, or one of more of them, has proximately caused serious damage to Plaintiff Welsh as set forth herein above.

58

208.  The acts or omission described herein  are outrageous and beyond the

bounds of decency in a civilized society.  As such, punitive damages are

justified against all defendants except Easton.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable

Court award judgment in his favor and against all Defendants, jointly and

severally, in an amount in excess of the One Hundred Fifty Thousand Dollar

($150,000.00) limit for adjudication in the District Court for the Eastern District of

Pennsylvania, as well as costs and reasonable attorneys' fees.


**COUNT IV**
**Joseph E. Welsh,  Plaintiff**
**v.**
**All Defendants**
**CONSPIRACY**
**42 U.S.C. §1985(3)**

209.  Paragraphs 1 through 208 inclusive, are incorporated by reference as if fully

set forth at length herein.

210.  Defendants conspired to deprive Plaintiff Welsh of equal protection of the

law and such other privileges and immunities to which Plaintiff Welsh was

entitled under the First and Fourteenth Amendments to the United States

Constitution.

211.  The Defendants did intentionally act to deny Plaintiff the equal protection of

59

the law, depriving him of his rights pursuant to the First and Fourteenth

Amendments as more fully described hereinabove.

212. The Defendants, during the time period set out in this Complaint, were

officers, officials, employees, representatives or agents of Defendant

Easton, and were acting under color or title of the laws and/or ordinances of

Easton..

213. Notwithstanding that, under the Constitution of the United States and the

laws of the Commonwealth of Pennsylvania, the Defendants were

empowered and duly authorized to prevent or assist in preventing the denial

of equal protection of the provisions of the Constitution of the United States

and Federal Laws and the laws of the Commonwealth of Pennsylvania to the

Plaintiff, the Defendants, acting in concert, wrongfully allowed the before

described actions and conduct to occur in violation of the said equal rights

of the Plaintiff.

214. The conspiracy of the Defendants, acting within the scope or parameters of

their official duties or acting independently, who willfully acted or failed to

act, deprived  the Plaintiff of his rights under the First and Fourteenth

Amendments as more fully described herein above.

215. The discrimination which the Plaintiff suffered and/or was intended to

60

suffer was predicated upon invidious discrimination against Plaintiff as a "class of one" as move fully detailed in Count III hereinabove.

216.   The Defendants (and in any event, more than one of them) formed a conspiracy for the specific purpose of depriving Plaintiff of his civil rights, and committed the acts or actions delineated hereinbefore in furtherance of that conspiracy.

217.   As a direct and proximate result of the deprivation of Plaintiff Welsh's constitutional rights  he suffered the injuries and losses and is entitled to the damages set forth herein above.

218.   The acts or omission described herein  are outrageous and beyond the bounds of decency in a civilized society.  As such, punitive damages are justified against all defendants except Easton.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable Court award judgment in his favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for adjudication in the District Court for the Eastern District of Pennsylvania, as well as costs and reasonable attorneys' fees.

61

## COUNT V
### Joseph E. Welsh,  Plaintiff
#### v.
### Linda Male
### Michael P. McFadden
### Timothy D. Pickel
### Sandra A. Vulcano
### Michael P. Fleck
### Daniel Corpora
### Burns Bamford
### Mayor Philip B. Mitman
### Stuart Gallaher
### William K. Murphy, Esquire
### Howard White
### David Fleck
### Robert Willever
### The City of Easton,
### Defendants

## NEGLIGENT OR WILLFUL FAILURE TO PREVENT VIOLATION OF 42 U.S.C. §1985 (42 U.S.C. §1986)

219.  Paragraphs 1 through 218 inclusive, are incorporated by reference as if fully set forth at length herein.

220.  Defendants, with the knowledge or reason to know of the conspiracy as set forth above to deprive Plaintiff of the equal protection of the law, all had the power and responsibility to prevent, or aid in preventing, the implementation of the acts in furtherance thereof, neglected and/or refused to take such actions as were within their power.

62

221.   As a direct and proximate result of the deprivation of Plaintiff Welsh's constitutional rights  he suffered the injuries and losses and is entitled to the damages set forth herein above.

222.   The acts or omission described herein  are outrageous and beyond the bounds of decency in a civilized society.  As such, punitive damages are justified against all defendants except Easton.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable Court award judgment in his favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for adjudication in the District Court for the Eastern District of Pennsylvania, as well as costs and reasonable attorneys' fees.

## COUNT VI
### Joseph E. Welsh,  Plaintiff
### v.
### All Defendants
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

223.   Paragraphs 1 through 222 inclusive, are incorporated by reference as if fully set forth at length herein.

224.   The aforesaid extreme and outrageous conduct, acts or omissions of the Defendants were calculated, designed, and intended by the Defendants to intentionally inflict deliberate emotional distress, psychological trauma, and

63

psychic pain and suffering upon the Plaintiff Welsh and to instill in his mind
an immediate and permanent sense of fear and trepidation, and said conduct,
acts or omissions surpass all bounds of decency universally recognized in a
civilized society.

225.   As a direct and proximate result and consequence of the aforesaid conduct,
acts or omissions of the Defendants, which constitutes extreme and
outrageous conduct, Plaintiff has suffered, is suffering, and will continue to
suffer for an indefinite time into the future the following:

1.    emotional and psychological distress and trauma;

2.    mental anguish;

3.    psychic pain and suffering;

4.    severe fright, horror, and grief;

5.    shame, humiliation, and embarrassment;

6.    severe anger, chagrin, disappointment and worry.

226.   The acts or omission described herein  are outrageous and beyond the
bounds of decency in a civilized society.  As such, punitive damages are
justified against all defendants except Easton.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable
Court award judgment in his favor and against all Defendants, jointly and

64

severally, in an amount in excess of the One Hundred Fifty Thousand Dollar

($150,000.00) limit for adjudication in the District Court for the Eastern District of

Pennsylvania, as well as costs and reasonable attorneys' fees.

**COUNT VII**
**Joseph E. Welsh, Plaintiff**
**v.**
**All Defendants**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

227.   Paragraphs 1 through 226 inclusive, are incorporated by reference as if fully

set forth at length herein.

228.   The aforesaid extreme and outrageous conduct, acts or omissions of the

Defendants recklessly, carelessly, or negligently caused infliction of

emotional distress, psychological trauma, and psychic pain and suffering

upon Plaintiff Welsh and to instill in his mind an immediate and permanent

sense of fear and trepidation, and said conduct, acts or omissions surpass all

bounds of decency universally recognized in a civilized society.

229.   As a direct and proximate result and consequence of the aforesaid conduct,

acts or omissions of the Defendants, which constitutes negligent infliction,

Plaintiff has suffered, is suffering, and will continue to suffer for an

indefinite time into the future the following:

1.   emotional and psychological distress and trauma;

65

2.     mental anguish;

3.     psychic pain and suffering;

4.     severe fright, horror, and grief;

5.     shame, humiliation, and embarrassment;

6.     severe anger, chagrin, disappointment and worry.

230.   The acts or omission described herein  are outrageous and beyond the bounds of decency in a civilized society.  As such, punitive damages are justified against all defendants except Easton.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable Court award judgment in his favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for adjudication in the District Court for the Eastern District of Pennsylvania, as well as costs and reasonable attorneys' fees.

**COUNT VIII**
**Sharon J. Davis,  Plaintiff**
**v.**
**All Defendants**
**LOSS OF CONSORTIUM**

231.   Paragraphs 1 through 230 inclusive, are incorporated by reference as if fully set forth at length herein.

232.   Plaintiff Davis witnessed the actions of Defendants in depriving her

66

husband of his statutory and constitutional rights, and depriving his family of the income which her husband produced, the outrageous and intentional nature of which cause her extreme emotional and psychic distress from which she continues to suffer.

100   As a direct and proximate result and consequence of the aforesaid conduct of the Defendants, Plaintiff Davis as a result of the aforementioned damages suffered by her spouse, has also suffered the following damages and injuries:

1.   Plaintiff Davis has been deprived of the consortium, companionship and services of the Plaintiff Welsh as a spouse;

2.   Plaintiff Davis has been deprived of the use, benefit and enjoyment of life; and

3.   Plaintiff Davis has been deprived of her spouse's earnings and loss of future earning capacity.

WHEREFORE, Plaintiff Welsh respectfully requests that this Honorable Court award judgment in his favor and against all Defendants, jointly and severally, in an amount in excess of the One Hundred Fifty Thousand Dollar ($150,000.00) limit for adjudication in the District Court for the Eastern District of Pennsylvania, as well as costs and reasonable attorneys' fees.

67

233.   Plaintiff demands a jury trial by twelve.

234.   Where permitted, the Plaintiff demands reasonable legal fees, costs, interest, expenses, delay damages, compensatory damages and any other damages deemed appropriate by the Court.

235.   Plaintiff requests that this Honorable Court issue declaratory and injunctive relief, as appropriate, declaring the within described practices to be unlawful, and enjoining their past and continued effects.

Respectfully submitted,
**KAROLY LAW OFFICES, PC**

Date: December 30, 2005

John P. Karoly, Jr., Esquire
Attorney for Plaintiffs
I.D. No. 22224
1555 N. 18th Street
Allentown, PA 18104
(610) 820-9790

68